**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES | : | Criminal Action No. |
| | : | |
| v. | : | 02-CR-644-1 |
| | : | |
| EDWARD BELLINGER, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM AND ORDER**

**Anita B. Brody, J.**                                    **November  8  , 2006**

On March 10, 2005, a federal jury convicted defendant Edward Bellinger of one count of

possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1).  Despite defendant's

failure to timely move for a judgment of acquittal or a new trial under Rules 29(c) and 33, I

granted an extension to file these motions after finding excusable neglect under Rule 45(b)(1)(B).

Because I find that the evidence was sufficient for a jury to reasonably infer that Bellinger

constructively possessed the gun recovered from underneath his car seat, and that it is not in the

interest of justice to grant a new trial, I deny both motions.

**I.  TRIAL**

On March 9, 2005, the trial began.

OFFICER GREEN

Officer Ronald Green was the government's first witness.  Officer Green testified that he

had been a Philadelphia police officer for approximately eight years.  (Tr. of March 9, 2005 Trial

(Doc. No. 74)  at 20.)  He testified that on April 2, 2002, he was on plainclothes patrol  in the

southwest section of Philadelphia with his partner, Officer David Beckett.  (Tr. at 22.)  Near

1

52nd and Catherine Streets, Officer Green saw a burgundy car with tinted windows.  (Tr. at 23-4.)  He believed that the dark tint of the windows violated the Pennsylvania Motor Vehicle Code.  (Tr. at 23.)   The officers activated their lights and sirens to signal the car to pull over.  (Tr. at 24.)  The car immediately pulled over beneath a streetlight and next to a parked car, and the officers pulled up behind them.  (Tr. at 24-6.)

Officer Green testified that he got out of the car and approached the burgundy car from behind.  Id.  As he did so, by the light of the streetlight he could see "shadows" or silhouettes of "people moving backwards, forwards, sideways" inside the car.  (Tr. at 27, 44.)  He could not tell how many people were in the car nor which passengers were moving.  Id.  He approached the driver's side window, and Officer Beckett approached the passenger's side.  (Tr. at 26.) The windows of the car were rolled up.  (Tr. at 27.)  The officers knocked on the windows and asked the occupants of the car to lower the windows.  Id.  Officer Green testified that it took about fifteen seconds after knocking for all of the windows to roll down.[1]  Id.

Officer Green testified that he saw three people present in the burgundy car: the driver, Delonda Pearson; the front seat passenger, Bellinger; and directly behind Bellinger, the back seat passenger, Jermaine Gailyard.  (Tr. at 28.)  Officer Green asked the driver, Pearson, for her license, registration, and insurance.  Id.  Pearson produced only her license, and could not give any information about who owned the car.  Id.  Bellinger was the one who answered the officers' questions, stating that the car belonged to his friend and that they had permission to drive it.  (Tr. at 28-9, 53.)  Bellinger looked through the glove compartment for the car's registration or proof

---

[1]  On cross-examination, Officer Green agreed that 15 seconds was a long period of time, but the police reports that he wrote shortly after the incident did not mention that detail.  (Tr. at 39-42.)

of ownership but could not find any.  (Tr. at 29.)  He only found a piece of paper that appeared like a bill for mechanic's work.  (Tr. at 29, 46-50.)

Officer Green testified that Officer Beckett was getting Gailyard, the rear passenger, out of the right side of the car when he heard a "clink" and Officer Beckett alerted him of a gun.  (Tr. at 29-30, 51.)  The gun was a loaded .45 Smith and Wesson pistol which had fallen from Gailyard's waistband, down his pant leg, and onto the ground. (Tr. at 29, 51.)  At that time, back-up officers were arriving in a marked car.  (Tr. at 30.)   Officer Green drew his weapon, crossed to the passenger side, ordered front passenger Bellinger out of the car, and directed a female back-up officer to secure driver Pearson while he secured Bellinger.[2]  (Tr. at 30-1.)

Officer Green testified that he handcuffed Bellinger face-down lying in the street in the "V" space between the car and the open door.  (Tr. at 64-5.)  As he was on his knees next to the car securing Bellinger, Officer Green spotted through the open passenger-side door the back of the gun handle and the hammer of a .40 caliber Beretta pistol.  (Tr. at 31, 38, 57, 64.)  The back butt of the gun was sticking out from the right-hand side of the passenger seat, a bucket seat, and the rest of the gun was "jammed" underneath the seat.  (Tr. at 31-2, 37-8.)   Officer Green testified that because of the limited space between the passenger seat, the floor of the car, and the door stop/jam,  the gun could not fit entirely under the seat.  (Tr. at 32, 37.)  Aside from these verbal descriptions, Officer Green also stepped off of the witness stand and visually demonstrated to the jury the location of the gun in the car and his position when he spotted the

---

[2] He chose to secure Bellinger instead of Pearson because of a police department policy prohibiting male officers from searching females.  (Tr. at 30-1.)

gun.[3]  (Tr. at 38.)

Officer Green removed the gun from the seat by the grip and made it safe.[4]  (Tr. at 32-3.)

Bellinger told Officer Green that the gun was not his and he did not know that its was there.  (Tr.

at 32-3, 51.)  No other contraband was found in the car or on Bellinger's person.  (Tr. at 51.)

Officer Green testified that the officers conducted a check with the National and Pennsylvania

Crime Information Centers and found that the car was not stolen.   The officers placed Bellinger

and Gailyard under arrest for carrying unlicensed firearms (Tr. at 70) and released Pearson, who

drove away in the car (Tr. at 52, 68).

Officer Green testified that Bellinger had been "more than cooperative."  (Tr. at 69.)  This

behavior, Officer Green explained, is "what made us so suspicious....  Because he wasn't

operating the vehicle.  He knew more about the car than the operator."  Id.


ANGELA LANDERS

The government's next witness was Angela Landers, owner of the burgundy car.  She

testified that she had known Bellinger from the neighborhood for about seven years.  (Tr. at 77-

8.)  She bought the car at an auction approximately three months before she loaned it to Bellinger

on the night of his arrest.  (Tr. at 78-9.)  She loaned the car to Bellinger at approximately 4:00

p.m. on April 4, 2002 after he asked to borrow her car to go to the store.  Id. The car was parked

---

[3] On cross-examination, evidence was introduced that, in his memo to the assigned detective for the case,
Officer Green merely described the location of the gun as being in Bellinger's "area of control." (Tr. at 58, 61.) In
his 7549 report, Officer Green wrote that he recovered the gun from the  "side of the front passenger seat."  (Tr. at
67.)

[4] Officer Green testified that he did not fingerprint the gun because it was not common practice for
Philadelphia police officers to do so for possession offenses, and because he had already concluded that the gun
belonged to Bellinger.  (Tr. at 33-4, 53-5.)

in front of her house at the time.  (Tr. at 79.)

Landers testified that she was the only person who drove the car.  Id.  The only prior passengers in the car had been family members.  (Tr. at 79, 81.)  She used the car only for going to work and to the store.  (Tr. at 81.)  There was only one set of keys to the car.  (Tr. at 79.)  She had never owned a gun or kept any guns in the car.  (Tr. at 79-81.)  She testified that there were no guns in the car when she lent it to Bellinger, which she knew because she had vacuumed her car.  (Tr. at 80-1.)


DELONDA PEARSON

The government's third witness was Pearson, the driver of the burgundy car.  Pearson testified that on the evening of April 2, 2002 she borrowed the burgundy car from Bellinger to take her fifteen-year-old family friend and a one-year-old boy that the friend was babysitting to the boy's house to get some diapers.  (Tr. at 85-7.)  When she borrowed the car, Bellinger was standing on a stoop on Seffert Street, Gailyard was around the corner, and the burgundy car was parked nearby.  Id.  Pearson testified that prior to the arrests later that evening she did not know who owned the car.  (Tr. at 91.)   Pearson drove approximately fifteen minutes to the boy's house, waited in the driver's seat for about ten minutes while her friend took the baby into the house, and then drove them back to Seffert Street.  (Tr. at 86-7.)

At this time, Pearson's  friend got out of the car with the boy, Pearson remained in the driver's seat, and Bellinger and Gailyard got into the car.  Id.  Bellinger got into the front passenger seat, and Gailyard got into the back seat.  (Tr. at 96.)  Bellinger told Pearson that they were going to give Gailyard a ride to 57th Street. (Tr. at 87.)

5

Pearson testified that as she drove past 53rd Street and Cedar Avenue, Gailyard told Pearson and Bellinger that an unmarked police car was behind them.  (Tr. at 88.)  Gailyard kept turning around.  Id.  Pearson told him to stop doing so because otherwise the police would pull them over.  Id.

Pearson testified that she was not carrying a gun that day, never put a gun into the car herself, and did she see her friend with the baby boy put a gun into the car.  (Tr. at 89.)  Nor had she seen either Gailyard or Bellinger with a gun that evening.  (Tr. at 91, 96.)  Bellinger never told her that he had a gun or that he knew that there was a gun under the seat.  (Tr. at 96.)  After Gailyard got out of the car, she heard an officer say "we got a gun" (Tr. at 91), but did not see Officer Green recover the Beretta from underneath the passenger seat (Tr. at 92).[5]


OFFICER BECKETT

The fourth witness was Officer Beckett, who testified that he had been a Philadelphia police officer for nine years.  He testified that he and Officer Green stopped the burgundy car due to its dark tinted windows at approximately 8:40p.m.  (Tr. at 100-1.)  As he pulled up behind the burgundy car, he "observed a lot of furtive movements, as far as up and down motions, and turning around.  You could see shadows, as [the car] came under the street light, and there was a lot of movement."  (Tr. at 101.)  Officer Green got out first and approached the driver's side of the car.  Officer Beckett then got out and approached the back passenger door, at which point the car's windows were rolling down.  Id.  It took ten to fifteen seconds for the car's occupants to

---

[5]  Contrary to Officer Green's testimony, she testified that she stopped the car in a parking spot and Bellinger was secured face-down on the pavement (i.e. the sidewalk), not in the street.  (Tr. at 97-8.)

roll down the windows.  (Tr. at 102.)  While Pearson sifted through "bunches and bunches" of

paper for approximately two or three minutes looking for the car registration,[6] Officer Green was

asking her questions.  Id.  Bellinger was replying to all of the questions even though Officer

Beckett asked Bellinger to be quiet and to let Pearson answer.  (Tr. at 102-3, 111.)

Meanwhile, Officer Beckett asked the backseat passenger, Gailyard, to keep his hands

where Officer Beckett could see them.  (Tr. at 102.)  Gailyard put his hands on his knees at first,

but then shifted them away from his knees; this happened more than once.  Id.  Officer Beckett

asked the passengers whether there were any weapons in the car.  They answered in the negative.

(Tr. at 103.)  After Gailyard could not produce any identification, Officer Beckett asked him to

exit the vehicle.  Id.  Beckett then secured a loaded .45 caliber Smith & Wesson gun that fell

from Gailyard's pant leg and yelled "gun."  (Tr. at 104-5, 107.)  Officer Beckett then handcuffed

Gailyard and recovered a cartridge with eight live .45 caliber rounds from Gailyard's right front

pants pocket.  Id.

Officer Beckett testified that he did not see Officer Green recover the second gun from

the front seat, but did eventually see the second gun and both guns were placed on property

receipts.[7]  (Tr. at 106.)  He also testified that the bullets recovered from the .45 Smith and

Wesson were much larger than the bullets recovered from the .40 Beretta.  (Tr. at 110.)

On cross-examination, Officer Beckett testified that while he was watching Gailyard in

the back seat, he also observed Bellinger talking to Officer Green.  (Tr. at 112.)

---

[6] On cross-examination, Officer Beckett first testified that he thought the car was "filled with debris and other items" (Tr. at 111), but subsequently added that he could not remember (Tr. at 115-6).

[7] Officer Beckett testified that he did not submit the .45 Smith & Wesson for fingerprinting because "that's left up to the assigned detective." (Tr. at 111.)

7

Q    And Mr. Bellinger was cooperative, correct?

A    Correct.  Exactly.

Q    And, as you had your eye on him, he wasn't attempting anything furtive, or evasive, or sneaky, correct?

A    When I had my eye on him, he was doing a whole lot of talking.

[…]

Q    Aside from his talking, he's not doing anything evasive, or –

A    He was moving, yes.  Yes, indeed.

Q    He's moving, but he's not being furtive about it, right?  I'll give you an example. He's not making any sudden movements, right?

A    Yes, he was.

Q    He was making sudden movements?

A    Yes.

Q    What kind of sudden movements was he making?

A    He was.  He was moving around in the front seat also.

Q    Well he's moving around, but he's not giving you immediate cause for concern, right?

A    The backseat [passenger] didn't give me immediate cause for concern at that particular time.

[…]

Q    I'm not talking about the backseat passenger, I'm talking about [Bellinger]. […] He's being polite and cooperative, and he's not causing any hassle.  That's all I'm trying to get at.

A    Everyone was being polite. [...] That's why we didn't [...] yank people out of the car when we first got there.

THE COURT:         Excuse me, Officer.  Let's just answer his question.  Was [Bellinger] being polite?

OFFICER BECKETT:  Yes, he was.

(Tr. at 113-15.)

        After Officer Beckett, the government called an expert witness who gave his opinion that the Beretta had traveled in international and interstate commerce.  The government also read into evidence a stipulation as to Bellinger's prior felony conviction.  Finally, the government called an expert witness who testified that the .40 Beretta was operable when recovered and that bullets from a .45 caliber gun would not fit into its chambers.  The government then rested its case.

        The defense also rested, after a colloquy in which Bellinger waived his right to testify.

8

On March 10, 2005, the jury returned a verdict of guilty.

## II. PROCEDURE

Rules 29 and 33 of the Federal Rules of Criminal Procedure provide specific time periods during which a defendant may move for a judgment of acquittal or a new trial.  Under Rule 29(c)(1), a defendant may move for a judgment of acquittal "within 7 days after a guilty verdict or after the court discharges the jury, whichever is later"; under Rule 33(b), unless there is newly discovered evidence, which is not claimed in this case, the motion for a new trial "must be filed within 7 days after the verdict or finding of guilty."

On March 14, 2005, four days after the jury verdict, Bellinger mailed a letter to his counsel at trial, Elliot Cohen, asking Cohen to file motions for acquittal and to subpoena police records.  (Def.'s Mot. New Trial (Doc. No 80), Ex. E.)  Cohen never complied with Bellinger's requests despite Bellinger's repeated attempts get him to file post-trial motions.[8]  Upon Bellinger's request, I appointed him new counsel, Ellen Brotman, who filed a motion for acquittal under Rule 29, or in the alternative for a new trial under Rule 33, based on the grounds of ineffective assistance of counsel and insufficient evidence.  (Doc. No. 80)  During the second

---

[8]  On May 23, 2005, I received a letter from Bellinger dated April 14, 2005 asking whether Cohen had filed Rule 29 or 33 motions on his behalf, and stating that Cohen had failed to respond to his request.  This letter was forwarded to Cohen on May 25, 2005 with instructions to report back to me by June 15, 2005.  In a letter dated June 20, 2005, Cohen explained that "I have advised the defendant that there is no basis to ask for a new trial pursuant to Fed.R.CrimPro. 33 or a judgment of acquittal pursuant to Fed.R.CrimPro. 29, since the jury was free to believe the government's witnesses."  On December 13, 2005, I received another letter from Bellinger, in advance of his scheduled sentencing, reiterating his dissatisfaction with Cohen and stating, "The Rule 29 and Rule 33 [motions] should've been filed as soon as I advised my attorney Mr. E. Cohen that I wanted him to file these issues immediately on my behalf...."  Despite Bellinger's clear awareness of the timeliness requirement, Cohen never filed any motions under Rules 29 or 33.  At an October 23, 2006 evidentiary hearing, Cohen testified that he never discussed moving for acquittal under Rule 29 with Bellinger after the trial because "[i]t's not my custom to do that... [n]or is it even my custom to even do that kind of Motion."  (Doc. No. 92, p.17.)  He also testified that he was not aware that he could have asked for a continuance of the seven-day post-trial time period to file a Rule 29 motion. (Doc. No. 92, p.25.)

of two evidentiary hearings about this motion, I granted defendant an extension of time to proceed with his motion based on Federal Rule of Criminal Procedure 45(b)(1)(B).[9]  (Tr. of Oct. 23, 2006 Evidentiary Hr'g (Doc. No. 92) at 42.)  Because defendant withdrew the portion of his motion based on ineffectiveness (Doc. No. 92 at 79), I now consider defendant's motion solely on the ground of insufficient evidence.

### III.  RULE 29(a)

#### A.      Standard of Review

If a jury returns a guilty verdict, "the court may set aside the verdict and enter an acquittal."  FED. R. CRIM. P. 29(c)(2).  As with Rule 29(a), a motion for judgment of acquittal after a guilty verdict must be based on the ground that evidence presented at trial was insufficient as a matter of law to support conviction.  United States v. Cohen, 455 F.Supp. 843, 852 n.7 (E.D.Pa. 1978), affirmed 594 F.2d 855 (3d. Cir. 1979).

To determine whether a jury verdict rests on legally sufficient evidence for Rule 29 purposes, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (emphasis in

---

[9]  Under Rule 45(b)(1)(B), "[w]hen an act must or may be done within a specified period, the court on its own may extend the time... after the time expires if the party failed to act because of excusable neglect."  Bellinger's failure to timely file was not a direct result of his own ignorance or lack of diligence.  See Consolidated Freightways Corp. or Delaware v. Larson, 827 F.2d 916 (3d Cir. 1987).  The type of neglect at issue here -- defense counsel's failure even to consult with his client about post-trial motions that the client repeatedly requested him to file – is completely excusable as to Bellinger, and warrants an extension of time.  See Solis v. United States, 252 F.3d 289, 293-4 (3d Cir. 2001) (finding defense counsel's failure to comply with defendant's request to file appeal prejudiced his client).

original); <u>United States v. Smith</u>, 294 F.3d 473, 476 (3d Cir. 2002).  All evidence must be viewed in the light most favorable to the government.  <u>Smith</u>, 294 F.3d at 476.  Moreover, the court must "presume that the jury properly evaluated credibility of the witnesses, found the facts, and drew rational inferences." <u>United States v. Wasserson</u>, 418 F.3d 225, 237 (3d Cir. 2005).

The burden lies with the defendant to prove insufficiency of evidence after a conviction. Because the court should be highly deferential to the verdict, <u>United States v. Hart</u>, 273 F.3d 363, 371 (3d Cir. 2001), this is a "heavy burden," <u>United States v. Gonzalez</u>, 918 F.2d 1129, 1132 (3d Cir.1990).  A finding of insufficiency should be "confined to cases where the prosecution's failure is clear."  <u>Smith</u>, 294 F.3d at 477.

### B.    Constructive Possession

To prove that Bellinger was a felon in possession of a firearm in violation of § 922(g)(1), "the government was required to prove the following elements beyond a reasonable doubt: (1) that [Bellinger] had previously been convicted of a crime punishable by imprisonment for a term exceeding one year; (2) that [Bellinger] knowingly possessed a firearm; and (3) that the firearm had passed in interstate commerce."  <u>United States v. Dodd</u>, 225 F.3d 340, 344 (3d Cir. 2000). The defense concedes that only the second element is disputable.  Moreover, because Bellinger was not found in actual possession of the Beretta, the precise issue is whether there was sufficient evidence at trial to prove that he had constructive possession of it.

A person has constructive possession of a thing when he or she, "although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion

11

or control over [it], either directly or through another person or persons." United States v. Lopez, 271 F.3d 472, 487 (3d Cir. 2001); United States v. Garth, 188 F.3d 99, 112 (3d Cir. 1999); United States v. Blackston, 940 F.3d 877, 883 (3d Cir. 1991). Proof that Bellinger constructively possessed the gun in question requires proving beyond a reasonable doubt: 1) Bellinger had knowledge of the gun's existence; 2) Bellinger had the power to exercise dominion and control over the gun; and 3) Bellinger had the intent to exercise dominion and control over the gun. See United States v. Iafelice, 978 F.2d 92, 96 (3d Cir. 1992) ("Constructive possession necessarily requires both 'dominion and control' over an object and knowledge of that object's existence."); Garth, 188 F.3d at 112 n.16 ("[T]he mere potential ability to exercise dominion and control does not establish constructive possession absent the intent to exercise it.").[10]

Various types of circumstantial evidence may be used to establish dominion and control, but few are sufficient as proof alone. Dominion and control are not established by "mere proximity to the [contraband], or mere presence on the property where it is located or the mere association with the person who does control the [contraband] or the property." United States v. Jenkins, 90 F.3d 814, 818 (3d Cir. 1996) (quoting United States v. Brown, 3 F.3d 673, 680 (3d Cir. 1993)); Garth, 188 F.3d at 112. Nor is simple ownership or control of a vehicle sufficient to establish constructive possession of an item in the vehicle. Brown, 3 F.3d at 683. Additional evidence linking the contraband to the defendant is necessary. Id. For example, "evidence that

---

[10]   Although the definition of constructive possession requires "dominion or control," the Third Circuit has adopted the view that the accused must have "both dominion and control" over an object. United States v. Iafelice, 978 F.2d 92, 96 (3d Cir. 1992) (internal quotations omitted); see also United States v. Garth, 188 F.3d 99, 112 (3d Cir.1999); United States v. Brown, 3 F.3d 673, 680 (3d Cir. 1993). According to Black's Law Dictionary, "'dominion'... implies both title and possession and appears to require a complete retention of control over disposition." BLACK'S LAW DICTIONARY 486 (6th ed. 1990).

the defendant attempted to hide or to destroy the contraband, or that the defendant lied to police about his identity or the source of large amounts of cash on his person," when coupled with proximity, may establish dominion and control.   Jenkins, 90 F.3d at 818 (citations omitted). Other commonly recognized "plus factors" include "connection with a gun, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise."  United States v. Booker, 436 F.3d 238, 242, (D.C. Cir. 2006) (quoting United States v. Alexander, 331 F.3d 116, 127 (D.C.Cir. 2003)); accord United States v. Newsom, 452 F.3d 593, 610 (6th Cir. 2006).

### C.    Discussion

Although there is no direct evidence that Bellinger knew of or had control and dominion over the Beretta, the evidence viewed in the light most favorable to the government established that a jury could have reasonably inferred  that Bellinger put it underneath his seat.  "Inferences from established facts are accepted methods of proof when no direct evidence is available so long as there exists a logical and convincing connection between the facts established and the conclusion inferred.  The fact that evidence is circumstantial does not make it less probative than direct evidence."   United States v. McNeill 887 F.2d 448, 450 (3d Cir. 1989) (cited in Iafelice, 978 F.2d at 97) (citation omitted).

Although proximity to contraband is not dispositive, when analyzing constructive possession of objects inside a vehicle proximity is a substantial consideration.  See U.S. v. Lopez, 271 F.3d 472, 487 (3d Cir. 2001) (finding fact that gun was within driver's reach to be

among the facts that a jury could use to infer possession); <u>Paez v. O'Lone</u>, 772 F.2d 1158 (3d

Cir. 1985) (holding that trial court may permit a jury to infer possession based on all

circumstantial evidence, including defendant's presence in the automobile where contraband was

found).  Evidence at this trial showed that Bellinger was extremely close to the Beretta when the

officers were standing next to the car.  It was jammed underneath his seat, but protruding enough

so that if he leaned to the side he could have reached the butt of the gun.

        In addition to proximity, five other "plus factors" are present in this case.  First, the

Beretta was found in a vehicle and was not easily accessible to other persons.  In cases involving

constructive possession of objects in vehicles, evidence needed to link a defendant to contraband

generally need not be as strong as when objects are found in residences, where spaces tend to be

relatively accessible to any occupants.  <u>United States v. Brown</u>, 3 F.3d 673, 683 (3d Cir. 1993)

(finding no constructive possession when drugs were found throughout a house, including

common areas like the refrigerator).  <u>See also</u> <u>United States v. Jenkins,</u> 90 F.3d 814, 816 (3d Cir.

1996) (no dominion and control established when drugs were found on a coffee table in the

living room).  Furthermore, bucket seats tend to isolate the area around the seat from other

passengers in the car.  <u>See</u> <u>United States v. Figueroa</u>, 2000 WL 1341923, at *4 (E.D.Pa. 2000),

<u>aff'd</u> 281 F.3d 225 (3d Cir. 2001) (finding that driver had constructive possession of contraband

located underneath his bucket seat).  In this case:

•       The Beretta was in a vehicle.

•       The Beretta was found underneath a bucket seat in which Bellinger was sitting.

•       The Beretta was jammed underneath the right side of the bucket seat at an angle difficult

14

for passengers other than Bellinger to reach.

The combination of these facts lends strongly toward an inference that Bellinger had control and dominion over the Beretta.

Second, based on the evidence introduced by the government, only Bellinger and Gailyard possibly could have placed the Beretta where it was found, and Bellinger was far more probable.  In this case:

•    Landers, owner of the car,  never owned any guns, never kept guns in the car, and was the only person who used the car (other than relatives she gave rides to).

•    There were no guns in the car when she loaned it to Bellinger at approximately 4:00 p.m., and there was only one set of keys to the car.

•    Between 4:00 p.m. and 8:40 p.m., when the arrests occurred, only five people entered the car: Pearson, Pearson's 15-year-old friend, a 1-year-old boy, Bellinger, and Gailyard.

•    Pearson, the driver of the car at the time of the arrest, never had a gun that day, never saw a gun in the car prior to the arrest, and never left the driver's seat after she entered the car.

•    Pearson's 15-year-old friend, the only person other than Bellinger who sat in the front passenger seat, was holding a one-year-old baby, and Pearson testified that she did not see the friend with a gun.

•    Gailyard immediately went to the back seat upon entering the car.

•    The Smith and Wesson gun that fell from Gailyard's pants required different sized bullets

than the Beretta gun.

For Gailyard to have surreptitiously placed the gun underneath Bellinger's seat, he must have been carrying two guns requiring different ammunition and decided to stash one of them in the car (presumably to avoid being found in possession of it) but not the other.  He also would have had to decide to reach around Bellinger's seat to hide the gun, rather than place it underneath the back of the seat.  A jury could reasonably have found this scenario most illogical and unlikely.  At the least, one can infer from these facts that Bellinger had knowledge of the gun's presence.

The third "plus factor" is Bellinger's relative control over the vehicle.  Control over a vehicle implies knowledge of and dominion and control over objects in that vehicle.  See Iafelice, 978 F.2d at 97 (owners and operators of vehicles usually know what is inside the vehicle); Figueroa, 2000 WL 1341923, at *3 (someone with substantial control over a vehicle tends to know what objects are inside it).   In this case:

•     Bellinger had possession of the only set of keys before lending the car to Pearson.

•     Pearson was giving a ride to Gailyard at Bellinger's request.

•     Bellinger was answering all of the officer's questions and looked for registration.

•     The only other person who had greater control over the car, the owner Landers, testified that no guns were in the car when she loaned it to Bellinger.

Bellinger may not have had long-term, continuous access to the car, but his actions suggest that he had substantial control over it when he was arrested.  Upon taking responsibility for the car, it is reasonable to believe that Bellinger would look around the inside.  The fact that the butt of the Beretta was protruding from under Bellinger's seat also enhances the likelihood that he would

16

know of its existence.

The fourth "plus factor" introduced at trial was suspicious activity.  When coupled with proximity to the contraband and control over a vehicle, suspicious behavior also weighs in favor of finding that occupants had knowledge of contraband inside.  See Iafelice, 978 F.2d at 97 (defendant drove the car in a suspicious manner and used a beeper to call co-defendants engaged in a drug transaction); United States v. Gonzalez, 2003 WL 735096, at * 2 (E.D.Pa. 2003) (defendant pushed officer and ran away when officer instructed him to turn around and put his arms behind his back).  In this case:

• After the officers knocked on the windows of the car, it took approximately 15 seconds for the passengers to roll down their windows.

• Despite being the passenger and not the driver, Bellinger was the most knowledgeable about the car and answered all the questions.  He was polite, but he was also moving around.

Both officers characterized Bellinger's behavior as suspicious.  (Tr. at 69, 113.)  A jury could have reasonably concluded that officers with 5 years (Green) and 6 years (Beckett) of police force experience were justified in this conclusion.

The fifth "plus factor" is evidence of evasiveness.  Attempts to conceal contraband are indicative of dominion and control over it.  Compare United States v. Davis, 461 F.2d 1026 (3d Cir. 1972) (finding constructive possession when defendant and others attempted to destroy the drugs before police entered the apartment), with Brown, 3 F.3d at 683 (distinguishing Davis partially because there was no evidence of destroying the drugs) and Jenkins, 90 F.3d at 820

17

(distinguishing <u>Davis</u> partly because destruction of drugs was a significant factor in finding

constructive possession).  In this case:

- When the car stopped under a street lamp, both officers noticed substantial movement
  inside the car in all directions – forwards, backwards, sideways, up, down, and turning
  around -- by "people."  Thus more than one person was moving around in the car.

- Pearson had told Gailyard to stop turning around after he spotted the police car, which
  leads to the inference that she was not turning around herself.

- Although neither officer saw Bellinger specifically moving before knocking on the
  windows of the burgundy car, Officer Green testified that he saw "a lot of furtive
  movements."

- The position of the gun – jammed underneath Bellinger's seat – indicates that there was
  an attempt to conceal it.

Evidence of bending over in a car seat after being stopped by police may be used to infer that a

defendant knew about contraband underneath that seat.  See <u>United States v. Lopez</u>, 271 F.3d

472, 487 (3d Cir. 2001) (finding power and intention to exercise control over gun found

underneath defendant's seat after defendant was seen crouching down in the car); <u>Figueroa</u>, 2000

WL 1341923, at *5 (finding defendant's "bending forward in the driver's seat prior to the search"

supports a juror's reasonable inference of defendant's knowledge of the contraband underneath

his seat).  In this case, the Beretta's concealed location, the significant movement in the car, the

ease with which Bellinger could have reached the Beretta, and the long delay in rolling down the

heavily tinted windows all give rise to the inference that Bellinger knowingly concealed the

Beretta from the officers.

As previously noted, there was no direct evidence introduced at trial that Bellinger knew

that the Beretta was underneath his seat and had the power and intent to control it.  However,

> [i]t is not unusual that the government will not have direct
> evidence. Knowledge is often proven by circumstances. A case can
> be built against the defendant grain-by-grain until the scale finally
> tips; and considering all the facts and drawing upon rational
> inferences therefrom, a reasonable jury could find beyond a
> reasonable doubt that the defendant committed the crime for which
> he is charged.

United States v. Iafelice 978 F.2d 92, 98 (3d Cir. 1992).  In addition to Bellinger's proximity to

the Beretta, the sum of the "plus factors" –  limited number of other persons who could have put

the gun there, inaccessibility of the gun to other persons in the car, Bellinger's relative control

over the car, and Bellinger's suspicious behavior, and evasive conduct – was sufficient to tip the

scales in favor of finding beyond a reasonable doubt that Bellinger constructively possessed the

Beretta.


## IV.  RULE 33

### A.     Scope and Standard of Review

Under Rule 33 of the Federal Rules of Criminal Procedure, a court may vacate a jury

verdict and grant a new trial "if the interest of justice so requires."  A new trial may be granted on

the ground that the jury's verdict is contrary to the weight of the evidence only if it "believes that

'there is a serious danger that a miscarriage of justice has occurred-that is, that an innocent

person has been convicted.' "  United States v. Brennan, 326 F.3d 176, 189 (3d Cir. 2003)

(internal quotations omitted).  The court may exercise its own judgement to evaluate the weight

of the evidence, but Rule 33 motions in this circuit are only granted "in exceptional cases."  Id.

### B.       Discussion

The government presented sufficient evidence at trial to prove beyond a reasonable doubt

that Bellinger had placed the Beretta underneath his seat.  The other possible ways for the Beretta

to have arrived where it was found are too narrow and unlikely.  Thus, I will deny the motion for

a new trial.

### ORDER

AND NOW, this    8th    day of November 2006, it is ORDERED the defendant's motion for

judgment of acquittal or, in the alternative, for a new trial (Doc. No. 80) is DENIED.

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:          Copies **MAILED** on _____ to:

O:\ABB 2006\Bellinger Memo and Order.wpd

20